**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN LINDSEY,<br><br>Plaintiff,<br><br>v.<br><br>COOK COUNTY HEALTH & HOSPITALS SYSTEM and OFFICER D'ORSAY MILLER,<br><br>Defendants. | ) | No. 23 C 433<br><br>Judge Sara L. Ellis |

**OPINION AND ORDER**

Plaintiff John Lindsey spent several days as a patient at Stroger Hospital ("Stroger"), a medical facility in the Cook County Health & Hospitals System ("CCHHS"), where he spent much of his time restrained in his hospital bed due to his allegedly aggressive and violent behavior. After his discharge, he filed this lawsuit against Defendants CCHHS and Officer D'Orsay Miller. He brings a claim for involuntary confinement in violation of the Fourteenth Amendment against CCHHS (Count I), for excessive force and failure to intervene in violation of the Fourth Amendment against Miller (Count II), and for unlawful restraint in violation of the Fourteenth Amendment against Miller and CCHHS (Count III).[1] CCHHS and Miller have filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because Lindsey cannot prevail on any of his claims based on the record before the Court, the Court enters judgment for CCHHS and Miller on Lindsey's second amended complaint.

[1] In his second amended complaint, Lindsey had also named two other officers as defendants, and included a placeholder for unknown officers. *See* Doc. 15. The parties filed a stipulation of dismissal as to the two named officers. Doc. 73. The statute of limitations has run as to the unnamed officers, and so the Court dismisses them from the case. Because Lindsey only has remaining claims against Miller and CCHHS, the Court does not address any arguments Lindsey raises in his response brief about holding these named Defendants liable for the actions of unnamed officers or CCHHS staff.

## BACKGROUND[2]

On October 28, 2022 at 8:38 a.m., Lindsey presented to the Stroger emergency department accompanied by his partner, Marion Johnson. Lindsey's medical records reflect that he presented to the emergency department "for hearing voices and threatening family members" and that he had "been off psych meds." Doc. 78 ¶ 3. According to these medical records, Lindsey had a history of schizophrenia, bipolar disorder, and substance use disorder, and he further admitted to using heroin while taking methadone. Johnson expressed concern to social workers in the emergency department about Lindsey's mental state and behavior at home, indicating that Lindsey "had not been sleeping, [was] talking/laughing to himself at home, [was] making verbal violent threats to the family, and [was] physically aggressive towards her recently." *Id.* ¶ 4. Johnson further reported that she feared for her and her family's safety, indicating a preference that Lindsey not know of her involvement in having him hospitalized because this could place her in danger.

Lindsey remained at Stroger for several days. On October 29, 2022 around 8:25 a.m., Lindsey's medical records reflect that he became aggressive, agitated, restless, and verbally abusive, and was unable to control his behavior or calm down. After his behavior escalated and attempted alternatives to restraints did not succeed, CCHHS staff placed him in restraints for his and the staff's safety. CCHHS staff discontinued the use of restraints at 3 p.m. that same day, assessing that Lindsey's behavior no longer required them. But Lindsey's behavior escalated again around 11:30 p.m. on October 30. As Lindsey attempted to comply with staff orders, an

[2] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, Lindsey's response, and the attached exhibits. The Court takes all facts in the light most favorable to Lindsey, the non-movant.

unidentified police officer deployed his taser against Lindsey.[3] On October 31 around 1:15 a.m., Lindsey again became violent toward the nursing staff, blocking the certified nursing assistant from leaving the room, indicating he would hurt her, and lunging at another staff member in the room. After staff asked Lindsey to return to his bed, he ran out of the room and chased a nurse down the hall, stating, among other things, that he would beat up the nurse and police too. This prompted Dr. Roberto Oleas Narea to put in a 48-hour order for restraints on October 31, 2022 at 1:28 a.m., with an end date of November 2, 2022 at 1:27 a.m. He listed the reason for the restraints as Lindsey's aggressive behavior towards staff. Lindsey remained restrained until November 1 at 7:45 a.m. despite the fact that numerous notations in his medical records indicate that he was calm and cooperative while restrained and at least one recommendation for earlier discontinuation of the restraints. After being released from restraints, Lindsey indicated he felt happy. On November 3, Lindsey was released from Stroger and placed at McNeal Hospital. He later was enrolled in methadone treatment at the Eva Mae Recovery Hope clinic in Englewood.

The CCHHS Police Department employed Miller. Miller did not work on October 28, the day Lindsey presented to the emergency department. Miller did work on October 29, 30, and 31. Miller had no recollection of any interactions with Lindsey between October 28 and November 1, 2022. Miller testified that he has never applied restraints to a patient at Stroger, nor has he seen any other police officer do so. But Lindsey recalls Miller being present on October 29 when CCHHS staff applied restraints to him.

[3] The Court does not have a clear picture of the events surrounding the deployment of the taser, nor with how the events in the late evening hours of October 30 interact with those in the early morning hours of October 31. Some evidence suggests Lindsey was restrained the entire time while a more plausible reading of the record would indicate that at some point the restraints were removed before the incident that involved Lindsey running into the hallway around 1:15 a.m. on October 31 occurred.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Claims against Miller

Miller first asks the Court to grant summary judgment on the claims asserted against him, arguing that he cannot be liable under § 1983 because he had no contact with Lindsey. "[T]o be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act[.]"). Personal liability exists where the conduct occurred at the defendant's direction or with his knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In other words, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Miller maintains that he could not have used excessive force, unlawfully restrained Lindsey, or failed to intervene in the use of force or restraints because he had no contact or interaction with Lindsey during Lindsey's hospital stay at Stroger. But Lindsey disputes this lack of contact, providing a declaration in connection with his response brief stating that he believes that Miller helped medical staff restrain him late the night of October 28 or the morning of October 29. Miller argues that the Court cannot consider this aspect of Lindsey's declaration because it contradicts the joint statement of undisputed facts and Lindsey's deposition. "As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996); *see also Bank of Ill. v. Allied Signal Safety*

*Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). But reading Lindsey's deposition closely, the Court does not find that his affidavit contradicts his deposition testimony. Miller has cherry-picked portions of Lindsey's deposition testimony, ignoring one of Lindsey's last statements in the deposition, that "on the 29th, [he] was put in restraints by Officer Miller . . . on the dayshift, between 7:00 to 3:00" and that Lindsey "remember[ed] [Miller] clear as day." Doc. 78-2 at 92:11–24. Additionally, Miller overstates the joint statement, in which the parties only agreed that "Officer Miller states that he had no interaction with Plaintiff on October 31, 2022, nor at any time between October 28, 2022, and November 1, 2022." Doc. 78 ¶ 15. A jury would need to evaluate the credibility of Lindsey's and Miller's testimony to determine whether the two actually had any interaction on October 29, given their divergent recollections. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) ("At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]"). That said, because Lindsey agreed to the statement that "Officer Miller has never applied restraints to a patient at Cook County Hospital, nor observed any other police officer to do so," Doc. 78 ¶ 26, Lindsey cannot now argue that Miller personally placed the restraints on Lindsey.[4] Instead, Lindsey only has a potentially viable failure to intervene claim with respect to the placement of restraints on Lindsey on the morning of October 29.

Turning to the merits of Lindsey's failure to intervene claim, the Court agrees with Miller that Lindsey cannot establish a genuine issue of fact on this claim. Lindsey appears to concede

[4] Lindsey's declaration tracks his agreement to this fact, stating not that Miller placed the restraints on him but rather that Miller was present when medical staff restrained him on October 29.

this by addressing a separate incident in which he does not allege Miller had any involvement in his response. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (finding claim abandoned when plaintiff failed to defend it against defendant's arguments on summary judgment); *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016) (plaintiff's failure to respond to defendant's argument that it was entitled to summary judgment on claim meant that plaintiff conceded that summary judgment on that claim was warranted). Even setting aside this concession, however, Lindsey cannot prevail on this claim. A plaintiff may prevail against an officer that did not himself infringe on the plaintiff's rights if the officer was present and failed to prevent another state actor from violating those rights despite a "realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The Seventh Circuit has implied that a "realistic opportunity to intervene" may exist whenever an officer could have "called for a backup, called for help, or at least cautioned [the other actor] to stop." *Id.* "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997).

The Court need not reach the question of whether Miller could have intervened to prevent the use of restraints because no reasonable juror could find an underlying constitutional violation. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"). Whether evaluated under the Fourth or Fourteenth Amendment, the relevant inquiry for excessive force is "whether the force was objectively unreasonable in light of the facts and circumstances of each particular case." *Dragisich v. Lazaris*, No. 20-cv-1465, 2026

WL 1746897, at *2 (E.D. Wis. June 17, 2026) (citation omitted). Factors to consider in evaluating the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting." *Id.* at *3 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Lindsey's medical records reflect that, at the time CCHHS staff placed Lindsey in restraints, Lindsey was aggressive, agitated, restless, verbally abusive, and unable to control his behavior or calm down. The medical records further indicate that he did not respond to directions, his behavior escalated, and attempted alternatives to restraints failed. No reasonable juror could find the use of four-point restraints to counter Lindsey's behavior unreasonable. *See id.* (no reasonable juror could find officer kneeling on the plaintiff's neck unreasonable where the plaintiff was "adamantly refusing medical care," "actively uncooperative," and was "thrashing around in an attempt to prevent the medical staff from evaluating him"). Therefore, Lindsey cannot succeed on any of his claims against Miller.

## II. Claim against CCHHS

Turning to Lindsey's claims against CCHHS, CCHHS first argues that Lindsey's claims against it fail because it is a non-suable entity. The Court agrees that CCHHS does not have a legal existence separate from Cook County (the "County") and thus is not a proper party. *See Johnson v. Cook Cnty. Sheriff's Office*, No. 16 C 07523, 2018 WL 2193235, at *2 & n.1 (N.D. Ill. May 14, 2018) (collecting cases finding that CCHHS has no separate legal existence apart from the County). In his response, Lindsey asks for leave to amend his complaint to name the County in CCHHS' place. *See, e.g.*, *Northern v. John H. Stroger Jr. Hosp. of Cook Cnty.*, No.

16 CV 05926, 2017 WL 4281053, at *4 (N.D. Ill. Sept. 27, 2017) (allowing a plaintiff to file a second amended complaint naming the County in place of Stroger as the defendant). While the Court does not believe such a request appropriate at this late stage, for completeness, the Court nonetheless considers Lindsey's claims against CCHHS as if asserted against the County.[5]

On the merits, Lindsey cannot hold CCHHS liable for a constitutional violation under § 1983 pursuant to the doctrine of *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). CCHHS may be held liable for its own constitutional violations, however, when "execution of [CCHHS'] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (a municipality "may be held liable for its own violations of the federal Constitution and laws"). To prove a *Monell* claim, Lindsey must demonstrate: "(1) [he] was deprived of a constitutional right; (2) the deprivation can be traced 'to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the federal-rights violation.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023).

Lindsey can demonstrate municipal action in three ways: "(1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law;" or (3) a constitutional injury caused by a person with final policymaking authority. *Est. of Moreland v. Dieter*, 395 F.3d 747, 758–59 (7th

[5] The Court nonetheless will continue to refer to the claims as asserted against CCHHS for purposes of the analysis.

Cir. 2005); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). With respect to the fault element, a plaintiff must prove that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights and that the municipality's action was the "moving force" behind the violation of the plaintiff's constitutional rights. *LaPorta*, 988 F.3d at 987 (citations omitted). Negligence or gross negligence is not enough, rather it must have been "obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* Further, a "direct causal link" must exist between the challenged municipal action and the violation of the plaintiff's constitutional rights. *Id.* Lindsey asserts that CCHHS violated his Fourteenth Amendment rights by involuntarily committing him and by unlawfully restraining him.[6] The Court considers these claims separately.

**A. Involuntary Commitment**

First, Lindsey argues that he had a liberty interest in avoiding involuntary confinement in a mental health facility, which CCHHS violated by keeping him hospitalized for six days without a valid basis to do so. Although Lindsey states in his declaration that his hospitalization resulted from an involuntary commitment order, nothing else submitted by the parties supports this fact. Even taking Lindsey's statement as true, Lindsey nonetheless cannot prevail on an involuntary confinement claim against CCHHS because no reasonable juror could find that a municipal action caused a constitutional violation.

Lindsey focuses on CCHHS Policy #BH.010, "Screening, Assessment, Emergency Treatment and Referral Process of Emotionally Ill Patients in Adult Emergency Department" (the "Confinement Policy"), maintaining that the Confinement Policy allows patients to present to the Stroger emergency room with mental health issues and "be confined in perpetuity without

[6] Lindsey does not assert his Fourth Amendment excessive force claim against CCHHS.

any procedural protections guaranteeing an opportunity to seek release." Doc. 84 at 7. But Lindsey has failed to point to anything in the record that would suggest that the Confinement Policy kept him from securing his release or otherwise led to a constitutional violation. And while he speculates that the Confinement Policy allowed CCHHS to confine patients with psychiatric issues in perpetuity, he has pointed to no evidence to support such speculation.[7] *See White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) ("We give [the nonmoving party] the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." (citations omitted)). More importantly, state law governs involuntary commitments, providing the procedural protections that Lindsey claims CCHHS' Confinement Policy lacked. *See* 405 Ill. Comp. Stat. 5/1-1 *et seq.* (Illinois Mental Health and Developmental Disabilities Code); Civil Mental Health Proceedings, Circuit Court of Cook County, https://www.cookcountycourtil.gov/division/county-division/civil-mental-health-proceedings (explaining the procedure for obtaining mental health evaluations and orders for involuntary commitments and involuntary treatment). Therefore, a reasonable juror could not find that the Confinement Policy caused Lindsey's alleged constitutional injuries.

**B. Unlawful Restraint**

Lindsey also maintains that the use of restraints in his case represented a "substantial departure from accepted professional judgment, practice, or standards," *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982), and had no "legitimate non-punitive purpose," *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). He argues that CCHHS deviated from CCHHS Policy #PC.005.01, "Patient Care: Restraints and Seclusion, Restrain Use and Patient Care" (the

---

[7] The Confinement Policy itself indicates that it does not operate in isolation, but rather in conjunction with other policies. *See* Doc. 84-3 at 5 (cross-referencing the "Inpatient Emotionally Ill Policy, Emotionally Ill Patient ED, and Emergency Psychiatric Services Policy"). This suggests that other CCHHS policies may outline limitations on a patient's involuntary confinement and opportunities for patients to challenge their confinement.

"Restraint Policy"), by failing to use the least restrictive restraints available, keeping him restrained for longer than necessary, and failing to remove the restraints to allow him to use the bathroom and shower, among other things. But even if CCHHS deviated from the Restraint Policy, such deviation does not amount to a constitutional violation on its own. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."). And the fact that CCHHS may have deviated from its Restraint Policy in Lindsey's specific case does not create a genuine issue of material fact as to whether a widespread custom or policy existed. "[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (citation omitted) (internal quotation marks omitted)); *see also Rossi*, 790 F.3d at 737 (a *Monell* claim requires "a *widespread practice* that permeates a critical mass of an institutional body," not "individual misconduct"). Lindsey only points to his own experiences of being restrained over the course of several days, which cannot create a genuine issue of fact as to whether CCHHS had a widespread practice of unconstitutional restraint. *See Hildreth v. Butler*, 960 F.3d 420, 426–28 & n.6 (7th Cir. 2020) ("Although this court has not adopted any "bright-line rules" defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three."); *Grieveson*, 538 F.3d at 774–75 (four instances over a period of eleven months that the plaintiff alone experienced were "not enough to foster a genuine issue of material fact that the practice was widespread"). For these reasons, the Court must enter judgment for CCHHS on Lindsey's claims against it.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [76]. The Court enters judgment for Defendants on Lindsey's second amended complaint and terminates this case.

Dated: August 24, 2026

SARA L. ELLIS
United States District Judge